Walter R. Hart, J.
In this article 78 (Civ. Prac. Act) proceeding, petitioner seeks an order annulling the determination of the respondent declaring that the tenants of the subject building would be entitled to a decrease in rent if the petitioner proceeded with its contemplated conversion of lobby space. Briefly, the record discloses the following state of facts:
The premises is a six-story building containing 89 apartments located in a fine residential community. Entrance is gained through a small vestibule leading into a spacious and attractive lobby, approximately 24 feet deep by 43 feet wide. To the left and right of such lobby one passes through two colonnades or archways leading into smaller interior areas where the elevators are located. The lobby is well lighted with windows on the street side and windows facing into the courtyard. The proposed change would remove 15 by 43 feet of the lobby space, converting the same into two 1%-room apartments. The balance of the lobby would then be condensed in an area of 9 feet wide by 43 feet long. It would further necessitate the removal of the windows facing the courtyard as they would become part of the apartments to be constructed and the removal of the furniture and furnishings presently situated there.
The question presented to the respondent was whether the' reduction of this lobby area would be a reduction of such essential services as to warrant a decrease in the rent of the tenants.
Petitioner argues that such a decrease in space, considering the entire area including the interior lobbies and elevator space, is not such a decrease in essential services warranting a decrease in the rent of the various apartments.
Definite aid cannot be obtained on this point from a reading of the precise language of the State Residential Rent Law or the rent regulations. promulgated thereunder. Section 4 (subd. 5, par. [b]) of the State Residential Rent Law (L. 1946, eh. 274, as amd.) or sections 24, 34 and 35 of the State Rent and Eviction Regulations do not preclude the respondent from finding that such a decrease in space constitutes a decrease in *901 essential services. Section 4 (subd. 5, par.' [b]) of the rent law and section 24 of the regulations provide for the continuation of “ essential services,” but do not define what they are. If anything, these sections greatly weaken the argument of the petitioner for section 24 of the rent regulations states that a landlord shall continue to provide “ the same essential services * * * as were provided, or were required to be provided ” on the freeze date. Section 4 (subd. 5, par. [b]) provides for discretionary power in the respondent to assure maintenance of what he shall deem essential services as they were provided on the freeze date.
It is undeniable that the present lobby has been in existence f or the use by the tenants since the construction of the building. It is further undeniable that the conversion would create a long passageway of 9 feet by 43 feet leading into the interior lobbies on either side, beyond the archways or collonades, and that the tenants would be deprived of a spacious lobby now in existence.
Neither the petitioner nor the respondent has been helpful in apprising the court of any authorities in point. An examination of the various cases relating to decreases in essential services fails to reveal any authority squarely on all fours. However, while not completely analogous, the court in its research found the following situation presented in Matter of First Terrace Gardens v. McGoldrick (1 N Y 2d 1). In that case, the petitioner moved to convert 10 elevators from manual to automatic operation and to make various structural alterations in the 10 buildings owned by the petitioner by eliminating the entrances and lobbies in 8 of the 10 buildings, leaving only the lobby of the 2 center buildings which would lead to the other buildings involved. The alterations and renovations therein were made in order to provide the petitioner with 16 new dwelling units. In the court below (285 App. Div. 1126), which affirmed the determination of the respondent denying the petitioner’s application, a strong dissenting opinion was written practically setting forth the very arguments presently raised by the instant petitioner as well as other arguments which could be raised by the petitioner. The dissenting opinion therein reads as follows: ‘1 The centralization of entrances does not in and of itself deprive the tenants of any essential service. It is not every diminution of service that is proscribed, but such only as affects an essential service to a substantial degree. As I see it, that is not the situation before us on this record. There is nothing in the rent laws which mandates continuance of the precise structural form or condition of the premises, especially outside of the apartments themselves. That equally effective means of ingress and *902 egress will be provided by central lobbies is apparent, when we consider that new high-class apartment houses of comparable size in Manhattan are being constructed with a central or common entranceway and have a unified and controlled delivery service available for the use of the tenants. Indeed, it is reasonable to assume that an owner would not undertake extensive and expensive structural alterations as contemplated here, unless he believed that they would ultimately improve his property. ’ ’
Despite such strong and able dissent, the Court of Appeals, in affirming the court below, stated: ‘ ‘ Under the rent act a landlord can no more remove a lobby than it could remove the elevators or any other facility essential to the tenants. Since the commission has the power to require continuance of protection in the lobby * * * it has the power to require continuance of the lobby and entrances themselves.”
In Matter of Shelton Properties v. Abrams (N. Y. L. J., Dec. 6, 1955, p. 5, col. 5 [Levey, J.]), the subject premises was a hotel. The services involved were a second-floor lounge and library facilities and the use of the solarium and terrace. The court held that permanent guests of the hotel. ‘ ‘ had been deprived of certain lounge and library facilities which had been available to them before the new management discontinued the second floor lounge and library, and converted them into commercial space”, and that when the solarium and terrace were rented by the owner for commercial functions there was “ a severe curtailment of their use by the guests.” The determination of the respondent therein was affirmed by the court.
It can be seen from the tenor of these analogous decisions that the respondent with its extensive powers granted by the Legislature to insure the continuance of essential services which the landlord is obliged to furnish as of the freeze date, was justified in coming to the conclusion that it did. Despite the chart or plan prepared by the petitioner, an examination of the photographs showing the proposed changes and the remainder of the lobby after such changes would be made, clearly demonstrate the soundness in the respondent’s determination. There is no doubt that such conversion would destroy the lobby. It would no longer be a spacious room but a passageway 9 feet deep and 43 feet wide. It is common knowledge that when a tenant rents an apartment in a fine residential community of our city he not only takes into consideration the size and number of rooms of his apartment but also the physical appearance of the building, the lobby and the locale. It is also common knowl *903 edge that when an owner of an apartment house fixes the rent of his apartments his computation takes in not only the space or area of the rooms rented but also such other space as the lobby area, hallways and appearance of the community. It necessarily follows that a curtailment of such space originally provided for the benefit and use of the tenants would be a decrease in essential services. Such conversion would eliminate a considerable portion of the natural light and air now obtained through the casement windows. As presently constituted, the entire lobby can be seen by a party entering the building, but upon conversion it would be possible for intruders to lurk around the corners of the newly created apartments without being observed. This would create a dangerous condition which at present does not exist.
As has been oft repeated in proceedings of this nature, the court, with the limited power of review which it has, cannot substitute its judgment for that of the respondent unless it is clearly shown that his determination was unfounded in fact, arbitrary, unreasonable or capricious (Matter of First Terrace Gardens v. McGoldrick, supra; Matter of Goodwine Realty Corp. v. Abrams, 1 A D 2d 959). There has been no showing by the petitioner that such is the case here. Accordingly, the petition is dismissed.